IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| GINA TASSONE, | ) |
| | ) |
| Plaintiff, | ) Case No. 15 C 8557 |
| v. | ) |
| | ) Judge Robert W. Gettleman |
| UNITED OF OMAHA LIFE INSURANCE | ) |
| COMPANY; and MIRAMED GLOBAL | ) |
| SERVICES, INC. LONG TERM DISABILITY | ) |
| PLAN, | ) |
| | ) |
| Defendants. | ) |

## MEMORANDUM OPINION AND ORDER

After plaintiff ceased working as a finance manager for her previous employer, MiraMed on March 30, 2012, due to a variety of ailments including morbid obesity, left lateral L4-L5 disc herniation with facet synovitis and synovial cyst producing foraminal stenosis, pulmonary embolism, fibromyalgia, and deep vein thrombosis ("DVT"), she applied for long term disability ("LTD") benefits, which defendant United of Omaha Life Insurance Company ("United of Omaha") approved and paid from June 2012 through June 30, 2014. Defendant continued paying from July 1, 2014 through August 31, 2014, under a reservation of rights while reviewing whether plaintiff was entitled to a continuation of benefits. Defendant terminated plaintiff's benefits on August 31, 2014. After exhausting her appeals, plaintiff brought the instant action against defendants United of Omaha and MiraMed Global Services, Inc. Long Term Disability Plan (the "Plan")[1], pursuant to ERISA § 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B), seeking reinstatement of LTD benefits. The parties have stipulated that the court will review: (1) the

---

[1]United of Omaha, the plan administrator, made the decision with respect to plaintiff's LTD claims. The Plan is a necessary party to this action. The court will refer herein to both as the "defendants."

administrative record containing approximately 5,400 pages of medical records; (2) an April 6, 2016 Functional Capacity Evaluation ("FCE"); a report of Dr. Jared Reeves, performed at the request of Administrative Law Judge ("ALJ") who ultimately awarded plaintiff social security disability benefits; and (4) the ALJ decision awarding those benefits. The parties have also stipulated that the court may conduct a trial on the papers and issue judgment pursuant to Fed. R. Civ. P. 52, and have filed cross motions for judgment supported by statements of material fact in the form used to support motions for summary judgment. For the reasons that follow, plaintiff's motion (Doc. 44) is granted, and defendants' motion (Doc. 47) is denied.[2]

## FACTUAL BACKGROUND

Plaintiff suffers from a variety of conditions and ailments, including: morbid obesity; left lateral L4-L5 disc herniation with facet synovitis and synovial cyst producing foraminal stenosis; bilateral C5-C6 and C6-C7 paraspinals with neurogenic denervation myofascial pain; cervical radiculitis; bilateral leg radiculopathy; fibromyalgia; interstitial cystitis; and a history of atrial fibrillation, pulmonary embolism, and deep vein thrombosis. Her health and ability to work began to deteriorate in December 2011 when she suffered a pulmonary embolism as a result of DVT in her left leg. Her treating physicians prescribed anticoagulants (Coumadin) to treat her DVT. She also had, however, a lengthy history of dysfunctional uterine bleeding that had not responded to treatment. As a result, plaintiff constantly required ongoing care for the interplay between the anticoagulants for the DVT and its effect on her dysfunctional uterine bleeding.

---

[2]This order contains both findings of fact ("Findings") and conclusions of law ("Conclusions"). To the extent that any Findings may be deemed conclusions of law, they shall also be considered Conclusions. To the extent that any Conclusions may be deemed findings of fact, they shall also be considered Findings. See Miller v. Fenton, 474 U.S. 104, 113-14 (1985)**.**

In February 2012 she experienced a sudden onset of chest pain, shortness of breath and heart palpitations. She went to the emergency room and was admitted for a full "work up." The work up revealed no new DVT or pulmonary embolism. Following that hospitalization, her primary care physician referred her to Dr. Inderjit Hansra-Godfrey, who examined plaintiff and put her on Prednisone. Dr. Hansra-Godfrey instructed plaintiff to visit the emergency department if her symptoms did not improve, and referred her for a polysomnogram (all night sleep study).

On March 6, 2012, Dr. Leela Rao conducted a pulmonary evaluation. Dr. Rao noted that plaintiff's use of anticoagulants has caused her stress and anxiety and that she had some unresolved sub-segmental thrombi. Plaintiff had been started on a small dose of anti-anxiety medication and had been feeling better. Dr. Rao assessed plaintiff's physical abilities using the Eastern Cooperative Oncology Group ("ECOG") performance status grading. She graded plaintiff at a 2, meaning that plaintiff was ambulatory and capable of all self-care, unable to carry out any work activities, but that she is up and about more that 50% of waking hours. Dr. Rao's plan was for plaintiff to continue taking Coumadin, repeat a thrombophilia work up in six months because her lupus anticoagulant tests were positive, and at least six months of anticoagulation because her December 2011 DVT was her first. Dr. Rao ordered plaintiff to follow up with her gynecologist and opined that plaintiff might need a hysterectomy if she required long term anticoagulation.

On March 7, 2012, plaintiff was evaluated by Dr. James McMahon, a cardiologist. Dr. McMahon determined that plaintiff's heart palpitations were low risk for V arrhythmia due to known hyperdynamic LV systolic function and a structurally normal heart. Dr. McMahon

3

placed plaintiff on a monitor to assess her tachypalpitations while plaintiff was on anticoagulants for DVT. Dr. McMahon also determined that plaintiff had an abnormal echocardiogram, and that her condition remained stable.

On Monday, April 2, 2012, following plaintiff's last day of work, she went to the emergency room due to groin pain. She underwent several imaging studies including hip x-rays, MRI of her hip, x-ray of the lumbar spine, and a CT scan of the abdomen with pelvis. On April 6, plaintiff had reported pelvic and leg pain with fatigue, menstrual periods lasting 14-17 days, increased urinary frequency and positional pain when sitting down, leaning back while sitting, reaching from side to side while sitting, and standing up. Plaintiff applied for short term benefits by phone on April 3, 2012, and had been ordered to remain off work for four weeks by Dr. Beth Froese, plaintiff's physiatrist.

On May 1, 2013, Plaintiff applied for LTD benefits under the Plan. Defendants determined that plaintiff's regular occupation as a finance manager is considered a sedentary occupation. Defendants approved plaintiff's claim and provided her LTD benefits under the policy's "Regular Occupation" definition of disability retroactive to July 1, 2012, acknowledging that plaintiff had been diagnosed with fibromyalgia, chronic myofascial pain, far left lateral disc herniation of the L4-L5 with fact synovitis and foraminal stenosis, and comorbidity factors of "asthma, interstitial cystitis, history of pulmonary embolism, and deep vein thrombosis."

On June 6, 2013, plaintiff saw Dr. John Hong, a pain management specialist for a follow up appointment because she was having pain in her left leg. She reported her pain as a 4 on a 10 point scale. Dr. Hong continued all of plaintiff's medications and scheduled a follow up two months later. She returned to Dr. Hong's office less than a week later on June 12, 2013, due to

lower back pain that had been radiating to her left anterior thigh. She characterized the pain as intermittent, moderate and throbbing. The pain worsened when she sat and she felt relief when she stood. Dr. Hong opined that plaintiff may benefit from an another transforaminal epidural injection. She had been utilizing an increased dose of Norco to manage her pain, but Dr. Hong cautioned her regarding the increased use of pain medication.

On June 12, 2013, Dr. Rao, plaintiff's hematologist, evaluated her prior to scheduling surgery for a hysterectomy. Dr. Rao summarized plaintiff's hematological health in a letter to other specialists. In that letter Dr. Rao explained that plaintiff's clots had resolved, but since going off the hormonal therapy she had had heavy irregular periods, and endometrial ablation had not been effective after initial benefit. Dr. Rao recommended that plaintiff would need DVT prophylaxis with anticoagulant therapy for eight weeks, an IVC filter if anticoagulation is not going to be used during surgery, and a suppository to address hemorrhoidal bleeding.

On June 26, 2013, Dr. Hong administered a transforaminal epidural steroid injection on plaintiff with sedation at L3-L4, L4-L5, and L5-S1. A week later, on July 4, 2013, Dr. Hong conducted a follow up evaluation due to generalized pain, low back pain, and leg pain. He noted plaintiff's history of fibromyalgia and left sided lower back and left leg paresthesias. He also noted evidence of lumbar spine degenerative changes and neuroforaminal stenosis, and did not recommend further steroid injections because plaintiff was receiving only temporary relief. Instead he recommended another surgical consultation and referred plaintiff to neurosurgeon, Dmitry Ruban.

5

Plaintiff saw Dr. Hong again on July 18, 2013, complaining of increased lower back pain. Her pain medication, Nucynta, was no longer controlling her pain and Dr. Hong discontinued its use.

On July 20, 2013, Dr. Hong sent plaintiff for lumbar imaging. The L4-L5 level demonstrated a diffuse disc bulge with a left paracentral and foraminal broad-based disc protrusion, resulting in severe narrowing of the lateral recess and moderate to severe left foraminal comprise. The radiologist opined that there was mild central canal stenosis and moderate facet and ligamentum flavum hypertrophic changes.

Plaintiff saw neurosurgeon Dr. Ruban on August 28, 2013. He opined that plaintiff was suffering from a left-sided L4 and a component of L5 radiculopathy secondary to a broad-based disc bulge at L4-L5. He discussed surgical options and advised that a fusion procedure would be a much more invasive and difficult surgery than a discectomy, but that it might be necessary to address plaintiff's problems. Also on that day Dr. Harel Deutsch, co-director of the Rush Spine Center evaluated plaintiff and opined that her latest MRI studies showed degeneration, lumbar spondylosis, and far lateral disc herniation at L4-L5 on the left side. Due to the severity of plaintiff's pain and failed conservative measures, he considered surgery as an option and recommended a left L4-L5 far lateral discectomy.

Plaintiff underwent the discectomy on September 5, 2013. Two weeks later she contacted Dr. Deutsch's office complaining that she was having severe pain in her left leg and hip. The following day Dr. Deutsch prescribed a course of steroids. On September 24, plaintiff reported that the steroids provided no relief, and Dr. Deutsch order an MRI. After reviewing the

MRI Dr. Deutsch indicated that plaintiff would not benefit from further surgery and that her pain was likely caused by fibromyalgia.

Two weeks later plaintiff saw Nitin Malhotra, a pain management physician associated with Dr. Hong, due to pain in her left leg. Plaintiff also had increased swelling in her lower legs. Dr. Malhotra recommended that plaintiff make an appointment with her surgeon as soon as possible. On September 23, Dr. Rao evaluated plaintiff. Dr. Rao noted that no clots were found during her venous Doppler studies the previous week. The following day, plaintiff saw Dr. Hong. She had completed a course of steroids and found no benefit. She continued to take morphine and Norco, both narcotic pain medications, which helped lower her pain from a 6 to a 5 on a scale of 10. She told Dr. Hong that her acute exacerbations of pain usually occurred when she was standing or walking. Dr. Hong's goal was for plaintiff to control her pain and taper off the extended release medication due to the risks associated with opioid medication. Plaintiff saw her primary care physician a few days later because the pain in her legs had gotten worse.

Plaintiff continued to see Dr. Hong for monthly visits. There appeared to be no significant change in her pain location or intensity. She continued to experience left leg pain and numbness and increased muscular tension and trigger point pain. She reported that she found herself often dropping pans when she attempted to cook and had tried to strengthen her muscles through physical therapy, which had not be successful. In November Dr. Malhotra treated plaintiff's myofascial pain syndrome with trigger point injections.

On November 26, 2013, plaintiff returned to Dr. Hong due to her ongoing pain. Her leg pain had improved somewhat since the surgery, but her neck and upper back pain were constant.

7

Physical therapy had not helped. Dr. Hong prescribed a new muscle relaxer and explained the pain medication may affect her ability to drive and operate heavy machinery.

In early December 2013 plaintiff was experiencing fatigue, sore throat, respiratory pause causing her to have difficulty breathing, and heart palpitations. Her primary care physician admitted her to the hospital to be evaluated with a CT chest scan for chronic embolism in the sub-segmental arteries, and a hematology evaluation, as well as a venous Doppler evaluation. Plaintiff's CT scan revealed linear nonocclusive central filling defects in the branches of her right pulmonary artery, where a more occlusive clot was demonstrated on the earlier CT in February 22, 2012. These defects may have represented a chronic clot. Dr. Rao ordered plaintiff to undergo leg Doppler studies to look for other causes of her shortness of breath. The Doppler examinations revealed no evidence of DVT in either of her extremities.

On December 19, 2013, she followed up with Dr. Malhotra, who reviewed her most recent MRI of her spine and opined that a transforaminal epidural steroid injection may be helpful for her residual post-surgical pain. Plaintiff could not, however, have an injection at that time because after her recent pulmonary embolism she had been put on Xarelto, an anticoagulant.

On January 20, 2014, plaintiff saw Dr. Hong for a follow up visit. At that time he prescribed physical therapy. The next month, she saw Dr. Ruban who evaluated her neck pain after her lumbar discectomy. Her leg pain had not completely resolved and her neck, shoulder and arm pain traveling to her head with headaches and spinal pain had developed since the last time he had evaluated plaintiff. Dr. Ruban examined her cervical spine MRI which revealed evidence of disc degeneration at C5-C6 and C6-C7 level with disc bulging. Dr. Ruban did not

see evidence of severe stenosis, and opined that plaintiff was suffering from axial neck pain with pain in her head and down her spine, but because he did not see any instability, he did not recommend surgical intervention until all conservative measures were exhausted. Plaintiff continued to see Dr. Hong periodically. Dr. Hong had noted that Dr. Ruban did not recommend surgery but plaintiff had continued to have upper extremity pain extending from the elbows diffusely into the hands.

At the end of March 2014, plaintiff underwent an EMG /nerve conduction test which revealed bilateral C5-C6 and C6-C7 paraspinals showing mild to moderated neurogenic denervation changes. Dr. Li Zhang, the interpreting neurologist, opined that the objective study was abnormal showing mild to moderate bilateral radiculopathy that was more significant on the left side.

On April 17, 2014, plaintiff went to the emergency room due to chest pain radiating into her right arm, headache, heart palpitations, and weakness. She was found to be in atrial fibrillation with rapid ventricular response. She was immediately placed on a Cardizem drip and her heart reverted back to normal. She was then admitted to the hospital for further evaluation. She maintained a normal sinus rhythm overnight and Dr. McMahon released her the following day.

Plaintiff visited Dr. Rao two weeks later. Dr. Rao determined that plaintiff is capable of self-care but unable to perform any work activities. On May 19, 2014, Dr. Rao determined that plaintiff's left leg was swollen and changed her Xarelto prescription to 20mg per day, and ordered follow up with the cardiologist.

9

Plaintiff continued to see Dr. Hong or his associate throughout May and June of 2014. She was controlling her pain with Opana ER 20mg/bid, in addition to Lyrica, tizanidine, Cymbalta and Xanax for other relief.

Plaintiff continued to see her various doctors throughout July and August of 2014, continuing to complain of pain and decreased range of motion in her neck and arms. On August 27, 2014, she saw Dr. Hong, who noted that a wrist brace with heat had been helping somewhat and noted that perhaps plaintiff may be taken off anticoagulants for a period of time so that she could receive a cervical epidural injection.

Defendants terminated plaintiff's LTD benefits as of August 31, 2014, concluding that her subjective pain complaints were not supported by objective evidence.

## **DISCUSSION**

The standard of review in an ERISA action seeking benefits is de novo unless the plan provides the administrator with discretionary authority to determine eligibility for benefits. Firestone Tire and Rubber Company v. Bruch, 489 U.S. 101, 115 (1989). The parties agree that the instant plan does not provide such discretion and that this court's review is de novo. Under the de novo standard, rather than determining whether the administrator's decision was arbitrary and capricious, the court makes an independent decision as to whether benefits are due. Krolnik v. Prudential Insurance Co. of America, 570 F.3d 841, 843 (7th Cir. 2009).

In the instant case, the policy provides that after receiving benefits for two years, the definition of disability changes to "you are unable to perform all the Material Duties of any Gainful Occupation." Gainful Occupation is defined as an "occupation, for which You are reasonably fitted by training, education or experience, is or can be expected to provide You with

10

Current Earnings at least equal to 60% of Basic Monthly Earnings within 12 months of Your return to work." Based on the Plan definitions and the nature of plaintiff's position, the parties agree that the lone issue for the court is whether the evidence establishes that plaintiff can, or cannot, work in a sedentary capacity on a full time basis.

As an initial matter, the parties have engaged in lengthy arguments about whether defendant has altered its decision about plaintiff's disability without any new evidence as plaintiff argues, or, as defendants argue, they initially awarded plaintiff two years of benefits under the policy limitation for self-reported symptoms, which provides:

> If Your disability is primarily based on Self-Reported symptoms, Your benefits will be limited to 24 months while You are insured under the Policy, unless You are confined as a resident impatient in a Hospital at the end of that 24-month period. The monthly benefit will be paid during the confinement.
>
> Self-Reported Symptoms means the manifestations of Your condition which You tell Your Physician, that are not verifiable using tests, procedures or clinical examinations standardly acceptable in the practice of medicine. Examples of Self-Reported Symptoms include, but are not limited to headaches, pain, fatigue, stiffness, soreness, ringing in ears, dizziness, numbness, and loss of energy.

The resolution of this argument is unnecessary. Whether defendants initially concluded that plaintiff was unable to perform the material functions of her job as plaintiff argues, or whether defendants simply awarded plaintiff benefits based on her subjective self-reported pain is irrelevant to whether plaintiff had on August 31, 2014, or has now the ability to work full time in the sedentary position.[3] Based on the court's review of the medical history, including the

---

[3]The court rejects any argument that the self-reported limitation bars plaintiff from receiving any benefits beyond the two years she has already received. The limitation "applies to illnesses or injuries that are <u>diagnosed</u> primarily based on self-reported symptoms rather than all illnesses or injuries for which the disabling <u>symptoms</u> are self-reported." <u>Weitzenkamp v. Unum Life Ins. Co. of America</u>, 661 F.3d 323, 330 (7th Cir. 2011) Plaintiff's disabling pain symptoms
continue...

number of injections and surgery plaintiff received and continues to receive to alleviate her pain, the court concludes that the answer to that question was and continues to be no.

Indeed, defendants cannot and have not attempted to dispute plaintiff's history of treatment in "search of pain relief." Instead, they argue that plaintiff has not objectively established that she was incapable of performing a sedentary occupation as a result of her pain. Relying on Holmstrom v. Met. Life Insurance Co., 615 F.3d 758, 770 (7th Cir. 2010), defendants argue that "[a] distinction exists however, between the amount of fatigue or pain an individual experiences which . . . is entirely subjective, and how much an individual's degree of pain or fatigue limits his functional capabilities, which can be objectively measured." (Citing Williams v. Aetna Life Ins. Co., 509 F.3d 317, 322 (7th Cir. 2007). Thus, without disputing plaintiff's subjective complaints, defendants argue that the objective tests in the record demonstrate that plaintiff is capable of performing at a sedentary level, which requires sitting six to eight hours a day. See Juszynski v. Life Insurance Co. of North America, 2008 WL 877977 *7 (N.D. Ill. Mar. 28, 2008).

The record contains two FCEs performed on plaintiff. The parties dispute how those reports should be read. The first, conducted on December 8, 2014, appears to indicate a physical demand category of "light," which is one step above sedentary. Plaintiff argues that the report simply indicates the level at which plaintiff was tested, but the demand category was listed under "results." The report indicates, however, that plaintiff had difficulty maintaining one position for over 15 minutes, affecting her ability to perform in regular full or part time jobs. Her pain

---

[3]...continue
are explained by objectively diagnosed infirmities including fibromyalgia, MRIs and surgery.

12

increased while performing standing, walking, sitting, and trunk activities. Significantly, the comments section of the report indicates that plaintiff was "able to sit for only 15 minutes," and "stand for 10 minutes." These results are hardly consistent with an ability to work full time at a sedentary level, let alone a light level.

The second FCE conducted on April 6, 2016, also lists plaintiff's "demonstrated physical demand level" at light. Again, defendants rely on this listing to argue that plaintiff does not qualify for benefits because she can perform at a light level, which exceeds the necessary sedentary level. This is, however, an exaggeration of the full report, for the actual testing results do not suggest that plaintiff could perform full time at any level. For example, the test results indicate that plaintiff could sit at a 26 minute duration, reporting at 24 minutes that she was in extreme pain. She was again in extreme pain after standing for 5 minutes. Again, these results are inconsistent with an ability to perform at a sedentary capacity for a full day.

Defendants denied plaintiff's benefits based on the opinions of United of Omaha's two clinical experts' review of the medical records, neither of whom ever examined plaintiff. First, Nurse Terri Cortese, opined that it "would be reasonable to expect [plaintiff] to be able to sit for 6 hours out of an 8 hour day, lifting no more than 10 pounds occasionally with possible frequent lifting of small objects weighing less than 10 pounds."

Next, Dr. Thomas A. Reeder, defendant United of Omaha's medical director, determined that plaintiff's medical records: (1) did not document any myelopathy, neuropathy, radiculopathy or brachial neuritis; (2) demonstrated no focal neurological deficits, impaired range of motion, muscle weakness or neurological abnormalities; (3) contained defuse pain complaints, regional pain symptoms, positive Waddell's tests and non-anatomic sensory findings, which all suggest

13

extreme symptom magnification; (4) do not contain any evidence of uncontrolled asthma, uncontrolled hypertension and adrenal insufficiency; (5) do not contain any evidence of impairment as a result of interstitial cystitis; (6) do not contain any evidence of impairment as a result of dysfunctional uterine bleeding; (7) do not contain any evidence of anemia; (8) evidence resolution of plaintiff's deep vein thrombosis and pulmonary embolism from December 2011 do not contain any evidence of further thrombosis or of a hyper-coagulable state; (9) document exercise stress testing of greater than 10 METs just prior to the date of disability provided objective evidence of plaintiff's work capacity, greatly succeeding the demands of a sedentary occupation; and (10) contain evidence of somatoform symptoms which suggests a psychological disorder, although there is no evidence of cognitive and psychological impairment.

Dr. Reeder then sent letters to a number of plaintiff's treating physicians, asking them to respond to his conclusions, including a clarification regarding their treatment and restrictions and limitations. In particular, his letter to Dr. Hong, plaintiff's pain treater, stated that the restrictions that Dr. Hong had placed on plaintiff "did not appear to be consistent with, or supported by the documentation in her records." Each of Dr. Reeder's letters indicated that if he did not get a response within 10 days, he would assume that the recipient was in agreement with his (Reeder's) conclusions that plaintiff was able to perform at a sedentary level. Not surprisingly, none of plaintiff's treating doctors responded to Dr. Reeder's challenge. Defendant argues that by failing to disagree, those treaters have tacitly agreed. The court disagrees. The letters were obviously written in a manner designed to lure the recipient into either agreeing with Dr. Reeder's limited and biased review of the records, or enter into a war of diagnoses with him.

There is no upside for any doctor to engage in a dispute with an in-house physician. Thus, the court places no significance on the doctors' silence to such a biased letter.

The court finds that the opinions of Dr. Reeder and Nurse Cortese are entitled to little weight. First, they are undoubtably biased given that both work for defendants. As for Nurse Cortese, the court finds nothing in the medical records to even marginally support her opinion that plaintiff could be expected to be able to sit for 6 hours out of an 8 hour day. That opinion appears to be woven out of whole cloth.

As to Dr. Reeder, as plaintiff points out, in a very similar case, his credibility and fairness has been questioned by a district court, given his failure to examine the plaintiff in that case and his willingness to ignore objective evidence in the medical records. Williams v. United of Omaha Life Ins. Co., 2013 WL 5519525 *14 (N.D. Ala. Sept. 30, 2013). Dr. Reeder has similarly ignored the objective evidence in the instant case, particularly the reports of Dr. Hong, plaintiff's pain treater, the MRI indicating neurogenic denervation changes and bilateral radiculopathy, the fibromyalgia diagnosis, and Dr. Rao's report that plaintiff was unable to perform any work activities. Indeed, Dr. Reeder's conclusion appears to be based exclusively on the reports of doctors treating plaintiff's maladies unrelated to her pain that, not surprisingly, did not prevent her from working. Yet, it is plaintiff's extreme pain that supports her claim for LTD benefits. It thus appears that "in reaching [their] decision to terminate plaintiff's benefits, defendant[s] relied on selective excerpts from it's medical records rather than the record in its entirety." Wilkes v. Unum Life Ins. Co. of America, 2002 WL 926279, *10 (W.D. Wisc. Jan. 29, 2002).

Thus, the court concludes that defendants' termination of benefits is "weakened by the fact that defendant[s] did not conduct an independent medical examination . . . of plaintiff before reaching [their] decision." Instead, they relied on their own physician who in turn relied on only a portion of plaintiff's medical records and had never seen or examined plaintiff. "The report of a non-examining, non-treating physician should be discounted when contradicted by all other evidence in the record." Id. at *8.

The court also places little weight on the "conclusions" in the FCEs that plaintiff demonstrated light physical demand levels. As noted already, none of the underlying test results support a finding of an ability to perform light work full time. Moreover, as noted in Williams, an FCE provides information as to what physical functions a plaintiff could perform for 2 to 3 hours on a particular given day. It does not effectively demonstrate a plaintiff's work capacity day in and day out. A more accurate evaluation would take place over a number of consecutive days to "gage plaintiff's response on the following day to the effects of the previous day's testing." Id. at *13. Nothing in those evaluations accurately measured the level of pain plaintiff suffers or how that pain affects her judgment or distracts from her work tasks. "The evaluation is only an accurate measurement of her physical ability during those three hours of that particular day, and can be misleading in a case where the underlying physical condition is fibromyalgia and rheumatoid arthritis, conditions causing significant pain." Id.

The court places greater significance on the reports of plaintiff's treating physicians because they are more familiar with plaintiff's conditions and circumstances. See Israel v. Colvin, 840 F.3d 432, 437 (7th Cir. 2016). In particular, the court credits Dr. Hong's reports that plaintiff could sit for no more than four hours per day limited to intervals of one to two hours.

16

Even this report, which is more liberal than the FCEs that indicate that plaintiff can sit for only 15 or 26 minute intervals, supports a finding that plaintiff cannot work full time at a sedentary level.

The court also places greater significance on the report of Dr. Jared Reeves, a neutral expert who issued an independent report to the ALJ deciding plaintiff's claim for social security benefits. Dr. Reeves concluded that plaintiff was disabled due to a disorder of the spine, citing to: (1) plaintiff's two MRIs of the lumbar spine dated April 22, 2012, and July 20, 2013; (2) a positive straight leg test; and (3) documented weaknesses of both legs.

Additionally, the court also places greater weight on ALJ Johnson's decision that plaintiff is totally disabled. For purposes of social security benefits determinations, "disability" is defined as the "inability to engage in any substantial gainful activity." 42 U.S.C. § 423(d)(1)(A). Of course, a decision by the Social Security Administration to award benefits is not binding on this court. Anderson v. Operative Plasterers and Cement Mason's Int'l Ass'n Level 12 Pension & Welfare Plans, 991 F.2d 356, 358-59. Nonetheless, courts in this district have found that such findings are compelling evidence of a claimant's disability with respect to an ERISA claim. Juszynski, 2008 WL 877977 at *12 (listing cases).

In short, the medical records indicate that plaintiff suffers from a significant number of infirmities that, taken together, leave her in significant pain. She has continually undergone treatment to alleviate that pain but, in Dr. Hong's words, has reached maximum medical improvement. The record unquestionably demonstrates that in her current physical condition she is unable to work full time at a sedentary level. Consequently, the court concludes that the

record demonstrates that plaintiff is disabled as defined by the Plan and awards plaintiff LTD benefits beginning on September 1, 2014.

Plaintiff has requested an award of reasonable attorney's fees and costs. ERISA expressly provides that "the court in its discretion may allow a reasonable attorney's fee and costs of action to either party." 29 U.S.C. § 1132. In light of the court's conclusion that plaintiff is entitled to LTD benefits, and that defendants' denial of those benefits was unjustified, it exercises its discretion to award a reasonable attorney fee. See Hardt v. Reliance Std. Life Ins. Co., 560 U.S. 242, 255 (2010).

Finally, plaintiff requests an award of prejudgment interest. ERISA does not expressly provide for such an award. The Seventh Circuit has held, however, that such an award is presumptively appropriate. Fritcher v. Health Care Service Corp., 301 F.3d 811, 819-20 (7th Cir. 2002). Consequently the court awards plaintiff prejudgment interest at the prime rate. See Gorenstein Enterprises, Inc. v. Quality Care-USA, Inc., 874 F.3d 431, 436 (7th Cir. 1989).

## CONCLUSION

For the reasons stated above, plaintiff's motion for judgment (Doc. 44) is granted, and defendant's motion for judgment (Doc. 47) is denied. Plaintiff is directed to prepare and present a proposed judgment order to the court on September 13, 2017, at 9:15 a.m. With respect to the award of attorney's fees, the parties are instructed to comply with Local Rule 54.3.

**ENTER:	August 30, 2017**

_____
**Robert W. Gettleman**

**United States District Judge**